CLAY *v.* STATE.

5066                                    366 S. W. 2d 299

Opinion delivered April 8, 1963.

*Shaver & Shaver,* for appellant.

*Bruce Bennett,* Atty. General, by *Richard B. Adkisson,* Asst. Atty. General, for appellee.

CARLETON HARRIS, Chief Justice. Sam Henry Clay was charged with the crime of burglary, the information alleging that Clay unlawfully broke and entered a house belonging to the prosecuting witness herein, and located in the city of Wynne, with the intention to commit a felony. After the court appointed counsel to represent appellant, a motion was filed for a Bill of Particulars, and the Prosecuting Attorney provided the information that the felony referred to was the offense of rape and/or sodomy. A plea of not guilty was entered and on trial Clay was found guilty of the offense of burglary, but the jury was unable to agree upon his punishment. Thereafter, the court fixed the punishment, and sentenced Clay to a term of 21 years in the Arkansas State Penitentiary. From the judgment so entered, appellant brings this appeal. For reversal, two points are relied upon, first, that the evidence is insuffi-

cient to show that appellant unlawfully broke into or entered the home of the prosecutrix, and second, the evidence is insufficient to show the criminal intent necessary to convict appellant of burglary. These points will necessarily have to be discussed together as the evidence offered by the state bears upon each separate contention.

The testimony reflects that the prosecuting witness received a telephone call on a Thursday afternoon, the party at the other end of the line inquiring if he could speak to a Miss Gatssinger. Upon being informed that no one lived at the residence by that name, the party said, "No, don't you remember, I talked to you in the saloon yesterday." The prosecutrix then advised the caller that he had the wrong number, and hung up.

The prosecuting witness awakened around 6:10 on the morning of March 4, 1962.[1] She heard someone walk up the steps to the house, which she took to be the paper boy, and, thinking nothing about it, "dozed for about 10 more minutes." She awakened of a sudden and turned on her light. "I do not know why. When I did, I saw this much of somebody. Not their head, but saw their arm, like this, around the bannister of my stairs, the thing that holds up the stair steps." She stated that a glove was on the hand that she saw, and when she yelled, "Who are

---

[1] The witness originally testified that the date was February 11, and the information charged that the offense was committed on that date. It developed, however, during the trial that she was confused about the date, and the proper date was undoubtedly March 4. The prosecuting witness subsequently testified that she reported the occurrence to the Chief of Police on the same day that it occurred, and if his records reflected March 4, "they would be correct." Out of hearing of the jury, the state moved that the information be amended to conform to the proof, i.e., to change the date accordingly, and counsel for appellant objected.

The court then inquired, in case it permitted the information to be amended, if counsel desired time within which to produce evidence concerning the change in date. This request was not made by appellant, and the court stated: "The court would not permit the information to be amended to reflect a different date if it appeared that such a change would materially and substantially prejudice the defendant's defense in this case. The reason that the court made the previous inquiry was so that it could be informed as to, whether or not, a delay in the immediate proceedings would, in the judgment of counsel for the defendant, enable them to provide evidence which might be productive of some recognizable defense. The question is one rather of fact than of law, and in the absence of a specific request for a continuance to some future time certain, the court will permit the information to be amended as indicated to conform to the proof introduced in the court."

you, and what do you want?'', the person fled. She then observed that the front door was ajar, but did not see anyone. Around two hours later, the witness received a telephone call and the person on the telephone apologized for coming to her house, for doing what ''he had did,'' and stated he was sorry and meant no harm, but ''had to see'' the prosecutrix. He inquired if she would meet him somewhere, and made other remarks, to which she replied, ''You get across town with your kind.'' The witness testified that she recognized the voice of the caller as the same man who had called on Thursday; immediately thereafter, she notified the Chief of Police and gave him the information which has been herein related.

The witness stated that on the same day, she found on the steering wheel of her car a paper (gross receipts tax monthly report form) which contained the following item of printing, ''I am playing this while you are sleeping'' (referring to radio). She also stated that her car would not start because the battery had ''run down.'' This paper also was turned over to the Police Department.

The evidence reflects that on March 7, the prosecuting witness received a paper back book through the mail, entitled ''Another Kind of Love.'' The inside cover and first page contained filthy and obscene language which had been printed by pencil, and which included the following phrase, ''The same thing Laura (one of the characters in the book) want to—do to—this other girl is what I want to do to you ......................'' (Here appeared the given name of the prosecuting witness.) Enclosed in the book was a printed letter which requested her to meet the writer of the letter at the ice plant. This book was likewise turned over to the authorities. About a month later, appellant was taken into custody. Among his personal effects was a card which had been issued to him by the Cross County Department of Public Welfare entitling appellant to food assistance. On the back of this card appeared a telephone number[2] which Kenneth Shaw, the Chief of Police at Wynne, testified was the telephone number of the prose-

---

[2] The name and address of another person also appeared on the back of the card, but apparently have no connection with the instant charge.

cuting witness. Other exhibits were offered in evidence which were taken from Clay's personal effects, but a discussion of these exhibits is not necessary in determining whether there was sufficient evidence to sustain the conviction.

Clay made a statement to Shaw in the presence of State Patrolman W. A. Tudor, which was reduced to writing and offered in evidence at the trial. According to these policemen, the statment was voluntarily made; Clay was not threatened, abused or coerced in any manner, and no promises were made to induce the giving of the statement. The officers testified that appellant was advised that he could have an attorney, but Clay declined the offer. In his statement, which was introduced into evidence, Clay related that he went to the home of the prosecuting witness on a Saturday night, sat in her car for a while (which was parked in the driveway), and at that time printed the words on the paper which she subsequently found on the steering wheel. He stated that the next morning (about 8:00 o'clock) he went back to the house and knocked on the front door, and upon doing so, the door "came open because it wasn't shut good." He said that he "stuck" his head in the door, but turned around and left when the prosecutrix came to the head of the stairs. He then stated that he called her on the telephone and told her that he was sorry for coming to the house; that he kept thinking about her and "wanted to be with her," and on the next day, he printed a letter which he sent to her, together with the book heretofore mentioned. Clay admitted printing words to the effect that he desired to commit the act of sodomy upon her, but stated, "I didn't really mean all of this stuff." Subsequently, according to the testimony of the police chief, Clay denied that he had gotten into the car belonging to the prosecutrix or that he had gone to her house. Appellant subsequently told the officers that a white man had told him to write the letter and mail it and had given him $2.00 for doing so. However, Clay later gave a statement to Deputy Sheriff Ivy Ringold and Officer Tudor to the effect that these last statements were not correct. Ringold testified that Clay reiterated

the truth of the original statement, *i.e.*, that he sent the book, printed the words in the book, and had intended to do to the prosecuting witness what he had printed. As the deputy quoted Clay, ''That was my intention, but now it is not.''

Eddis Heath, a barber of Wynne, testified that appellant was employed by him in February and March of 1962, as a shoe shine boy. Heath stated that he saw the book, ''Another Kind of Love,'' in the possession of appellant, and also saw the hand printing on the inside of the cover and the first page; that Clay put the printing in the book around the last of February. Heath also testified that he saw Clay printing a letter, which was done at the same time the printing was placed in the book. The barber said that he picked up both the book and letter and glanced at them, noticing the printing, but did not read the contents. He testified that the last time he saw appellant with the book, the latter was ''wrapping it up'' in paper similar to Exhibit 1, placed in evidence by the State.[3]

Four letters were offered in evidence which Clay purportedly had written to the prosecuting witness. These letters bear the signature of ''Sam Henry Clay,'' ''Samuel H. Clay,'' and ''Sam H. Clay.''

No evidence was offered on behalf of the appellant.

To summarize, we have the testimony of the prosecuting witness that a person did unlawfully enter her home; that she received a call on Thursday, and a call on Sunday (following the entry) from a person seeking a date; that she received the book, ''Another Kind of Love,'' which contained hand printed matter (wherein the person doing the printing expressed the desire to commit the act of sodomy upon her); she found the printed note on the steering wheel, the note indicating that someone was sitting in her car, playing the radio; and the battery of her car was ''run down'' to the extent that the car would not start. The testimony of Heath corroborates that Clay had the book in his possession at the shop, that he printed words in the book, and wrapped it in the manner in which

---

[3] This exhibit consisted of the book, and paper in which it was wrapped.

it was received by the prosecuting witness. The testimony of the Chief of Police, Kenneth Shaw, established that the telephone number of the prosecuting witness was found in the possession of appellant, and appellant admitted the acts herein enumerated. We have held that the extrajudicial confession of a defendant, accompanied by proof that the offense charged was actually committed by someone, will warrant a conviction. *Monts* v. *State,* 233 Ark. 816, 349 S. W. 2d 350; *Ezell* v. *State,* 217 Ark. 94, 229 S. W. 2d 32, and cases cited therein. Here, of course, there are several facts that corroborate the admissions of the appellant. We think the testimony is sufficient to establish that Clay unlawfully, and with the intent to commit a felony, entered the home of the prosecuting witness. We have held that the offense of burglary is complete even though the intention to commit a felony is not consummated. *Thomas* v. *State,* 107 Ark. 469, 155 S. W. 1165, and cases cited therein. The prosecutrix[4] testified positively that the intruder was coming up the stairs, that she saw part of his body, and that he fled when she screamed. Clay admitted his presence at the house on this Sunday morning, though he stated that he only ''stuck'' his head in the door. We think the evidence is sufficient that Clay entered the premises for the purpose of committing a felony, *viz.,* sodomy. As stated in *Duren* v. *State,* 156 Ark. 252, 245 S. W. 823, ''It is not essential that the state prove by direct evidence an intention to commit a felony, for this fact may be, and generally is, established by proof of circumstances which indicate the intention of the burglar***''. We are of the opinion that the circumstances herein set out constituted evidence of a substantial nature, and justified the jury in reasonably finding that Clay entered the home with the intention to commit a felony.

No contention is made that the confession was unlawfully obtained, and no ruling of the court which would constitute prejudicial error, is asserted. It is simply contended that the evidence is not sufficient to establish that

---

[4] This term has been used throughout the opinion, interchangeably with "prosecuting witness" to prevent embarrassment to the intended vitcim, though, of course, the state is the actual party.

404

Clay entered the home, or that he entered with the intention to commit a felony. As herein stated, we find no merit in these contentions.

The judgment is affirmed.

Holt, J. not participating.